Filed 10/31/25  In re J.T. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re J.T., a Person Coming Under the Juvenile Court Law. _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Petitioner and Respondent,<br><br>        v.<br><br>M.Y.,<br><br>        Defendant and Appellant. | B344551<br><br>Los Angeles County Super. Ct. No. 24PSJP00119 |

    APPEAL from an order of the Superior Court of Los Angeles County, Stacy Wiese, Judge.  Affirmed.

    Daniel A. Vespi, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Petitioner and Respondent.

_____

A mother appeals the juvenile court's finding that the Indian Child Welfare Act (ICWA) does not apply in her case. The mother initially denied any Native American ancestry, but later said she had Cherokee ancestry through her maternal grandmother. The Los Angeles County Department of Children and Family Services (Department) then contacted the mother's mother, her father, and her maternal great-aunt, all of whom denied Native American ancestry in their family. The Department never contacted the Bureau of Indian Affairs or the Cherokee tribe.

We grant the Department's unopposed request for judicial notice, which includes post-appeal orders from the juvenile court.

We affirm. Undesignated statutory references are to the Welfare and Institutions Code.

I

On September 26, 2024, the Department received a referral that the mother was neglecting her infant daughter J.T. At this time, the mother and J.T. were living at a women's shelter. The caller said the mother showed symptoms of paranoid schizophrenia and described the mother as "confrontational and very intimidating." Although the mother fed and cleaned J.T., the mother appeared detached from J.T. and would not attend to J.T. when she cried.

A Department social worker spoke with the mother the next day. The mother told the social worker J.T.'s father is a famous musician professionally known as Drake, whom she had

2

met at a concert in Arizona and was having sex with regularly. The mother also said she had just gotten off the streets and escaped a sex trafficker.

Just a few weeks later, on October 10, 2024, the Department received a second referral alleging the mother was neglecting J.T. The caller reported seeing the mother "passed out" and smelling a "very, very" strong odor of phencyclidine (PCP), while J.T. was crying loudly. J.T., who at this time was five weeks old, was only wearing a diaper and was very cold to the touch.

That same day, a Department social worker interviewed the mother. When the social worker asked about substance use, the mother admitted to smoking cigarettes, methamphetamine, and "a lot of PCP." Despite knowing it was "not right," the mother said she bought "psychiatric meds off the street" because of her PTSD. The mother repeated her earlier claim that J.T.'s father was Drake, whom she referred to as "Aubrey."

The mother also told the social worker she had two older children, whom Maricopa County officials had removed from her custody while she lived in Arizona. The mother claimed she was "royalty," and could offer the social worker diamonds and other luxury items in exchange for her children.

The social worker became concerned that the mother was under the influence and was having a mental health crisis. She contacted law enforcement for assistance, and two police officers arrived within 10 minutes. One of the officers began to speak to the mother, who admitted to using PCP on a daily and hourly basis while caring for J.T. The mother also admitted that one day earlier, she fell asleep while breast-feeding J.T., and that J.T. had fallen to the side of the bed. The officers arrested the mother

3

for child endangerment.  The Department detained J.T. and placed her with a foster parent.

Along with its section 300 petition alleging neglect by the mother, the Department filed a detention report stating ICWA does not apply.  According to the report, the mother denied having Native American ancestry.  Furthermore, two shelter employees and the responding police officers said the mother did not disclose any Native American ancestry when she spoke to them.

At the initial hearing on October 15, 2024, the juvenile court ordered J.T. detained from the mother.  The court also noted the mother denied any Native American ancestry and found ICWA did not apply, but ordered the Department to continue its investigation and apprise the court of any new information about possible ICWA status.

Later that month, the Department received a call from W.B., who said he might be J.T.'s father.

In November 2024, another social worker spoke to the mother, who had moved to a substance abuse residential treatment facility.  Although she admitted to having sex with W.B. during the relevant timeframe, she maintained W.B. was not J.T.'s father.  She also admitted she initially said Drake was J.T.'s father because she "didn't want the [Department] in her business or knowing who the father is."

Furthermore, in contrast to her earlier statements, the mother claimed for the first time to have "Indian ancestry," but did not know what tribe.  The mother said "there is no one else" when the social worker asked if she could provide the names and contact information for family members or other people who might have additional information.

W.B., who lived in Cincinnati, had come to Los Angeles to attend the next hearing, which was on November 18, 2024. W.B. denied having any Native American ancestry in his family. The court also acknowledged the mother's recent statement that she believed she had Native American ancestry, and asked the Department to continue its efforts to speak to J.T.'s relatives. W.B. told the court the mother had been diagnosed with schizophrenia and said "you might want to take the ancestry with a grain of salt, you know, because she wasn't kind of in her right mind."

The arraignment hearing took place on December 4, 2024. When the court asked the mother about Native American ancestry, the mother responded: "I do have Indian fellowship [through my maternal grandmother]. My grandparents passed away, so I can't ask them. I have to do my own due diligence." The mother initially denied knowing what tribe her maternal grandmother might belong to, but then claimed it was the Cherokee tribe. Based on this information, the court stated: "There is no reason to know this child is an Indian child within the meaning of ICWA. I will find ICWA does not apply at this point given the lack of information we have now."

In December 2024, a LabCorp paternity test revealed W.B. is J.T.'s biological father. The following month, a Department social worker called to tell W.B. about the test results. During their conversation, W.B. again denied having any Native American ancestry.

At the adjudication hearing in January 2025, the court found W.B. to be J.T.'s presumed father. The court also sustained the section 300 petition's allegations. The court revisited the ICWA issue, noting the Department had spoken to

J.T.'s maternal grandmother H.T., who said the family has no Native American ancestry and denied the mother's statement that J.T.'s maternal great-grandmother had Native American ancestry.  Based on this information, the court again found ICWA did not apply, but ordered the Department to continue following up on the issue.

In February 2025, a Department social worker spoke to the mother's great-aunt A.J. and mother's father A.Y.  Both denied having Native American ancestry; A.J. said all of the family is "Black" and A.Y. said his family is "African-American."

The disposition hearing took place in February 2025.  On ICWA, the court asked the mother if she had any further information on Native American ancestry, and the mother said no.  The court noted the Department's inquiries with A.J. and A.Y,, and made another finding that there was no reason to know J.T. is an Indian child within the meaning of ICWA.

II

The mother's sole contention on appeal is that the juvenile court erred in finding ICWA does not apply.  Citing *In re Rylei S.* (2022) 81 Cal.App.5th 309, 314 (*Rylei*), the mother argues we should reverse this finding because the Department never contacted the Bureau of Indian Affairs and the Cherokee tribe despite the mother's multiple statements that she believed she had Native American ancestry.

Subdivision (i)(2) of section 224.2 provides that we may reverse a juvenile court's determination that ICWA does not apply "based on sufficiency of the evidence."  The Supreme Court has noted "that the juvenile court's fact-specific determination that an [ICWA] inquiry is adequate, proper, and duly diligent is a quintessentially discretionary function . . . subject to a deferential

standard of review." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1141 [internal citations omitted] (*Dezi*).)

In its response, the Department asserts the mother forfeited her right to challenge the juvenile court's ICWA finding because her opening brief fails to address the evidence supporting the court's ICWA finding—namely, the statements of three maternal relatives denying any Native American ancestry. The Department further argues substantial evidence supports the juvenile court's ICWA finding.

Although it is true that the mother's opening brief simply states the Department interviewed three relatives without mentioning what the relatives said, we agree with the mother that it is not appropriate to resolve an ICWA notice issue on forfeiture grounds. (See *In re Isaiah W.* (2016) 1 Cal.5th 1, 13 [because ICWA protects the interests of Indian tribes that are "separate and distinct from the interests of parents of Indian children," parents cannot waive ICWA's notice requirements].) We therefore examine whether "sufficient evidence and record documentation" support the juvenile court's finding that the inquiry was adequate and ICWA does not apply. (See *Dezi, supra*, 16 Cal.5th at p. 1141.)

In *Rylei*, the appellate court found the Department failed to make an adequate investigation into the child's possible Native American ancestry. (*Rylei, supra*, 81 Cal.App.5th at p. 318.) Although the mother in *Rylei* told the Department she might have Cherokee ancestry through her maternal grandfather, the Department only interviewed one maternal relative before ceasing its investigation. (See *ibid.*) The *Rylei* mother's statement triggered the duty of further inquiry under section 224.2, subdivision (e). (*Id.* at p. 319.)

7

But *Rylei* does not help the mother in her attempt to prove the juvenile court erred in this case. Unlike *Rylei*, the Department here interviewed the mother's mother, her father, and her great-aunt, all of whom denied any Native American ancestry in their family. This is evidence sufficient to support the juvenile court's finding that ICWA does not apply. (See *Dezi*, *supra*, 16 Cal.5th at p. 1141.) Moreover, the court was well within its discretion to give more weight to these statements than to those of the mother. (See *In re Kenneth D.* (2024) 16 Cal.5th 1087, 1102 ["It is ultimately within the purview of the juvenile court to make determinations of credibility . . . based on its familiarity with the case and those involved"].)

## DISPOSITION

We affirm the juvenile court's order.

WILEY, J.

We concur:

STRATTON, P. J.

VIRAMONTES, J.